## A08A1310. CASH v. THE STATE.
(669 SE2d 731)

ADAMS, Judge.

Waltrant Cash was found guilty by a jury of aggravated child molestation. He appeals following the denial of his motion for new trial.

The victim, who was 16 years old at the time of trial and 15 years old when the incident giving rise to the charges was alleged to have occurred, testified that Cash was at that time married to her sister Courtney,[1] and that during the summer of 2004, he also became her track coach through the Villa Rica recreational department track program. The victim testified that the team was traveling to Savannah for their first track meet of the season and that she and about five of the other members of the team were spending the night at Cash's home so that they could leave from there the next morning.[2] The victim testified that Courtney had gone to sleep in the bedroom and that the team members, who were sleeping on pallets on the living room floor, had fallen asleep but that she and Cash were still awake in the living room and watching television. The victim testified that at some point Cash asked her "to give him head." At first she refused, but ultimately agreed after he asked her four or five times so he would "leave [her] alone."

The victim testified she and Cash went down to the basement and Cash pulled his pants down and told the victim to put her mouth on his penis. The victim testified that she did as she was told. Afterward, Cash and the victim went back upstairs, the victim returned to the living room and Cash went to his own bedroom where Courtney was already sleeping.

The victim testified about another incident that occurred later in the summer when the team traveled to Iowa for the National Junior Olympics. The victim testified that Cash and his brother accompanied the team on that trip and that she shared a room with them. She

---

[1] Cash and Courtney were divorced at the time of trial.
[2] The victim subsequently indicated the date was June 28, 2004.

testified that one day when Cash's brother was not there, Cash again told her to "give him head." At first she refused, but he threatened to hit her so she did what he asked.

The victim testified that several months after the trip Cash came to her school and got her out of class to talk to her. He told her that he and Courtney had separated, that Courtney and their child were going to be living at the victim's house with her family, and that the victim "better take care of his child because [her sister] wasn't a good enough mom to do it." He also asked the victim not to tell anybody about what had happened between them.

The victim testified that several months after the Iowa incident, and after Cash and Courtney had separated, she went out on a call with her father, who was a driver for a wrecker service, and he commented that something seemed to be wrong with her and asked her what it was. The victim then told him about the Iowa incident but not what had occurred in Cash's home before the Savannah track meet.

The victim's father also testified. He testified that the victim went with him one night when he was out on a call and that he asked her what was bothering her because she had not been her usual cheerful and loving self. He testified the victim did not tell him any specifics but told him something had happened in Iowa and that they would talk later. They returned home and the victim told her father and her mother about "some things" that had happened on that trip. Her father asked her to tell them "something about [Cash] that none of us should know about, and she described him from the waist down[,] what he looked like." The victim's father testified that he first contacted officials in Carroll County about these allegations and then contacted the authorities in Iowa.

Captain Brian Camp, the commander of criminal investigations in the Villa Rica Police Department, also testified. Camp testified that on September 13, 2004, the department received a request from the police department in Des Moines, Iowa asking for their assistance in gathering information on a complaint concerning sexual allegations against Cash that they had received from the victim's father. Camp testified, over a hearsay objection, that he interviewed the victim and that she told him that Cash had forced her to perform oral sex on him while they were in Iowa.

Camp testified that he next interviewed Cash, who denied the Iowa incident. Camp then talked to the victim again, who made the same general allegations, although with a few differences in the surrounding circumstances, concerning the sexual assault in Iowa. Following this interview, Camp spoke with Cash again, who again denied all sexual contact with the victim and told Camp that he

thought the victim's father was "making all this up to keep him from being able to get custody of [his] child."

Cash came to Camp's office again on October 12, 2004, to undergo a polygraph examination. Both Camp and the polygraph examiner, Morris Nix, testified that prior to the polygraph being administered, Cash made the statement that the victim had performed oral sex on him at his home in Carroll County about eight to nine months prior to that time. This statement was not reduced to writing. Camp testified that he then contacted the Carroll County sheriff's department concerning the investigation since Cash's residence was outside the Villa Rica city limits and thus not in his jurisdiction.

Diane Henderson, an investigator with the Carroll County Sheriff's Department, also testified. Henderson interviewed first the victim and then Cash. Both interviews were recorded and played for the jury. In her interview, the victim told Henderson about the incident the night before the Savannah track meet and about the incident in Iowa. Henderson then interviewed Cash about these incidents and he denied that either of them occurred. He also stated that he believed these allegations had been made against him because of issues stemming from his divorce from Courtney. He told Henderson that he was having health problems and also felt like he was under pressure to make an admission the day the polygraph was scheduled.

Courtney also testified. She said that after they separated Cash admitted that something had happened between him and the victim at their house. She testified that after his arrest he told her what he said previously did not happen but he thought it was what she wanted to hear, and if she thought he was being truthful with her, she might forgive him and take him back.

Two members of the track team who spent the night at Cash's house the night before the Savannah track meet also testified. According to their testimony, the team members were watching movies, and the victim was the first one to fall asleep in the living room after the movie was over. The witnesses testified that they were still awake when Cash and Courtney went to bed together in their bedroom. One of them specifically testified that Cash never came back out of the bedroom that night, except to "poke[ ] his head" out to tell everyone to go to bed around midnight or 1:00 a.m.

Cash denied the charge against him, and testified that he only made the statement to Camp and Nix after Nix had "[b]asically hounded me for 30, 40 minutes" to "tell the truth" and "go ahead and admit that you did something." He testified that he told Camp and Nix that the victim had performed an act of oral sodomy on him about eight to nine months previous. He said he made this state-

ment, although it was not true, because he "was positive" they were going to send him to jail because they had not done the things they had told them they would do to investigate the Iowa allegation to see if it was true. Cash testified he told the officers the assault occurred here because he did not want to be extradited to Iowa to face charges since he would not be able to see his daughter there. He testified that he subsequently denied the charges to Henderson when he realized the exact nature of the charges against him, and that he gave her the names of everyone at his house that night and told her that it would have been impossible for the incident to have occurred given the circumstances.

Cash also testified that the victim was the first to fall asleep that night and that he and his wife and child went to bed after the victim fell asleep but while the rest of the track team members were still awake. He testified that at one point he opened his bedroom door and told the team members who were still awake to go to sleep but that he never came back out of his bedroom that night.

Cash contends that the trial court erred by finding that the victim's out-of-court statements were admissible under the Child Hearsay Statute because the victim was over 14 years of age at the time the statements were made. OCGA § 24-3-16. The record shows that Cash objected to Camp's testimony about the victim's statements on this basis, and the trial court overruled his objection and ruled that the statements were admissible. Although Cash posed no objection to the testimony of the victim's father concerning what the victim had told him or to the victim's taped interview with Henderson, he now contends that this evidence also was improperly admitted. Cash further asserts a claim of ineffective assistance of trial counsel because of counsel's failure to object to these statements, which we will also address more fully below.

The State does not argue that the out-of-court statements were properly admitted under the Child Hearsay Statute, but argues instead that the statements were admissible as prior consistent statements under the holding of *Woodard v. State*, 269 Ga. 317, 320 (2) (496 SE2d 896) (1998).

The State misconstrues *Woodard*.

> Importantly, *Woodard* held that only if affirmative charges of recent fabrication, improper influence, or improper motive are raised during cross-examination is a witness's veracity placed in issue so as to permit the introduction of a prior consistent statement. Even then, the prior consistent statement may be admitted as nonhearsay only if it was made before the motive or influence came into existence or before the time of the alleged recent fabrication. Otherwise,

it is pure hearsay, which cannot be admitted merely to bolster the witness's credibility.

*Phillips v. State*, 241 Ga. App. 764, 766 (527 SE2d 604) (2000).

The State argues that in Cash's opening statement and in his cross-examination of the victim's father he sought to show that the father prompted the victim to fabricate the allegations against him, thus making charges of improper influence and improper motive. However, as the transcript shows, Cash's theory of defense was that the victim's father influenced the victim to make the allegations against Cash after Cash and Courtney separated in an attempt to affect potential custody issues with their child. This separation occurred prior to all the out-of-court statements that were admitted here, and thus, as Cash correctly points out, the victim's out-of-court statements were made after, not before, the alleged improper influence came into existence. We reiterate, "[w]hen a witness is alleged to have been motivated or influenced to testify falsely, his or her prior consistent statement may be introduced only if the prior statement was made before the alleged motive or influence came into existence." *Thompson v. State*, 281 Ga. App. 627, 631 (3) (636 SE2d 779) (2006). It follows that the prior consistent statements were not admissible under the circumstances here. *Phillips*, 241 Ga. App. at 766-767. "Thus, we can only conclude that the prior consistent statement was hearsay evidence improperly admitted to bolster the witness's credibility in the eyes of the jury." *Woodard*, 269 Ga. at 320-321 (2). Compare *Nguyen v. State*, 294 Ga. App. 67 (668 SE2d 514) (2008); *McClendon v. State*, 287 Ga. App. 238, 241 (3) (651 SE2d 165) (2007); *Brown v. State*, 273 Ga. App. 577, 580 (2) (615 SE2d 628) (2005).

We must therefore determine whether reversal is required. The State argues that any error was harmless because other legally admissible evidence of the statements was admitted at trial. See *Hanson v. State*, 263 Ga. App. 45, 46-47 (1) (587 SE2d 200) (2003). But as our Supreme Court clarified in *Baugh v. State*, 276 Ga. 736 (585 SE2d 616) (2003):

We have often said that the erroneous admission of hearsay is harmless error where legally admissible evidence of the same fact is introduced. See, e.g., *Felder v. State*, 270 Ga. 641 (8) (514 SE2d 416) (1999). However, that rationale is inapplicable when the hearsay is the prior consistent statement of a testifying witness whose veracity has not been attacked. This is so because the very nature of a prior consistent statement is that it is repetitive of that to which the witness has already testified. Instead when the hearsay

is a witness's prior consistent statement, the erroneous admission of the witness's hearsay statement is reversible error if it appears likely that the hearsay contributed to the guilty verdict.

(Citation and punctuation omitted.) Id. at 739.

The State argues any error in the admission of the victim's prior consistent statements was harmless because Cash admitted an act of oral sodomy occurred to Camp and Nix and he admitted to Courtney that something occurred. But Cash testified at trial and denied that any acts of oral sodomy took place and offered an explanation for both his statement to police and to Courtney. Moreover, he never admitted that anything occurred the night before the Savannah track meet or in Iowa. He also offered the testimony of two witnesses who refuted the victim's account of the events that night, including when the members of the group, including the victim, fell asleep and when Cash went to bed. Inasmuch as there was no physical evidence to present to the jury, the jury was required to evaluate the credibility of the victim and Cash to determine if the crime took place. We agree with Cash that the improper bolstering of the victim's credibility added critical weight to her testimony and did contribute to the verdict. *Phillips*, 241 Ga. App. at 767-768; see also *Warner v. State*, 277 Ga. App. 421, 423 (1) (626 SE2d 620) (2006).

Although the State does not argue that Cash's failure to object at trial to the introduction of the videotaped statement of the victim about the incidents or to her father's testimony concerning what she told him about the Iowa incident necessitates that these statements be analyzed differently, we will also address Cash's separate claim that this failure denied him effective assistance of counsel at trial. Although the State argues "trial counsel made a strategic decision to present all of [the victim's] statements as an attempt to discredit her through her discrepancies," trial counsel testified at the motion for new trial hearing that his failure to object was not part of his trial strategy and that he "should have objected each time anybody relayed hearsay from that victim. . . ." Because the statements were not legally admissible evidence and should have been excluded upon proper objection, the performance of trial counsel fell below an objective standard of reasonableness when he failed to object at trial. See *Forde v. State*, 289 Ga. App. 805, 808 (658 SE2d 410) (2008). It follows that this failure resulted in harm to Cash, thereby satisfying the prejudice prong of *Strickland v. Washington*, 466 U. S. 668, 687 (III) (104 SC 2052, 80 LE2d 674) (1984). But see *Forde*, 289 Ga. App. at 809. Based on the foregoing, we find that Cash is entitled to a new trial. It is thus unnecessary for us to address his remaining enumerations of error.

*Judgment reversed. Smith, P. J., and Mikell, J., concur.*

DECIDED NOVEMBER 20, 2008.

*Howard J. Weintraub*, for appellant.
*Peter J. Skandalakis, District Attorney, Anne C. Allen, Assistant District Attorney*, for appellee.